UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRENTON CORPORATION,
a Michigan corporation,

       Plaintiff,                                 CASE NO. 06-15699
                                                  HON. LAWRENCE P. ZATKOFF

v.

SUPERIOR CORROSION CONTROL,
INC., JOHN WILLIAMS, and MARK
BRADLEY,

       Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on January 25, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

This matter is before Court upon Plaintiff's Motion for a Preliminary Injunction against Defendants, preventing them from allegedly infringing on Plaintiff's trademarks.[1] A hearing was held on January 23, 2007, and the parties each submitted briefs with exhibits, including affidavits. For the following reasons, Plaintiff's Motion will be DENIED.

---

[1] Plaintiff's complaint contains eight counts. Only the first two counts are based on federal law. In the absence of complete diversity, the Court declined to exercise its supplemental jurisdiction with regard to Plaintiff's other six state law claims, and dismissed them without prejudice in a separate Order. Consequently, the Court will only consider Plaintiff's federal trademark claims for the purposes of this motion.

## II.  BACKGROUND

Plaintiff Trenton Corporation ("Trenton") is a Michigan corporation having its principle place of business in Ann Arbor, where it manufactures its products. Defendant Superior Corrosion Control, Inc. ("SCC"), is a Delaware corporation doing business in Clinton Township, Michigan. Defendant Williams was employed by Trenton at various times as a sales representative for a total of four years. Defendant Bradley was also employed by Trenton until he resigned on September 1, 2006. Both individual Defendants reside in Michigan and are now affiliated with SCC.

Trenton is a family owned company that has been making and selling petroleum wax-based anti-corrosion products, including wraps, coatings, and fillers for pipeline and marine piling protection since 1949. One of the principle uses of Trenton's products is the protection of gas and oil pipelines. Trenton markets and sells its products to major oil, gas, water and chemical processing companies through a network of distributors and sales representatives.

One of Trenton's products is a wrap used to fight corrosion of metal surfaces above and below ground that has been continuously marketed for at least fifteen years under the trade name "Pile Inner-Wrap." Moreover, Trenton, has continually marketed for approximately 50 years one of its other products under the trade name "Innercoat," a mark which Trenton has recently registered as a federal trademark. Trenton's Pile Inner-Wrap is a poly-fiber felt material, saturated with a petroleum wax blend and corrosion inhibitors to provide an anti-corrosive barrier. Innercoat, on the other hand, is a microcrystalline wax blend that is used as an anti-corrosive pipe coating. Several of Trenton's competitors produce similar products under similar marks.

Defendant Bradley was employed by Trenton in various positions for approximately 19 years.  In those positions, Bradley had access to Trenton's product formulas and manufacturing

processes, as well as products under development. On September 1, 2006, Bradley voluntarily resigned his position at Trenton, and Trenton thereafter compensated him for consulting services for several months.

Sometime in October 2006, SCC's website appeared on the internet marketing anti-corrosive products, including primers, wraps, and outer wraps, which have applications similar to Trenton's products. For example, SCC's Step II Inner Wrap has a similar application as Trenton's Pile Inner-Wrap. According to SCC, its Step II Inner Wrap is designed for a use similar to Trenton's Inner-Wrap, but their actual uses are different. Whereas SCC's wrap is used in above and below ground piping, Trenton's wrap, according to SCC, is for marine use only. Furthermore, SCC's products no longer have similar formulas to Trenton's products. According to SCC, all of its products are formulated using petrolatum[2] and, as such, are more similar to products currently marketed by Trenton's already existing competitors than to Trenton's own products.

Trenton's President, Charles Kennedy, provided a description of Defendant Bradley's employment history with Trenton, and a synopsis of the efforts Trenton took to develop its product formulas and manufacturing techniques. *See* Kennedy Aff. ¶¶ 1-4, 9-10. Though he stated that SCC appeared to be marketing products with similar formulas to those of Trenton, and that Bradley had intimate knowledge of Trenton's formulas, Mr. Kennedy provided no information bearing on the issue of whether SCC's mark infringes on Trenton's mark.

Similarly, at the January 23 hearing, Trenton's primary focus was Bradley's knowledge of the industry and Trenton's formulas. Trenton did produce demonstrative evidence showing the

---

[2] Petrolatum is a semisolid mixture of hydrocarbons obtained from petroleum, often used in medicinal ointments and lubricants. *See* WEBSTER'S NEW RIVERSIDE UNIVERSITY DICTIONARY 879 (1984).

3

similarity in appearance between the parties' products; however, this evidence also demonstrated the dissimilarity between the parties' marks. On the other hand, SCC represented that it had not infringed Trenton's mark because Trenton's mark is widely used to describe a product that provides anti-corrosive protection of gas, oil and water pipelines.

### III. LEGAL STANDARD

A court is to consider the following four factors in determining whether a plaintiff is entitled to a temporary restraining order or other preliminary injunctive relief:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued;

(3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). The standard for preliminary injunction is not a rigid and comprehensive test, and the four factors are to be balanced, not prerequisites that must be satisfied, but instead "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.* 963 F.2d 855, 859 (6th Cir. 1992).

### IV. ANALYSIS

The issue in this case is whether SCC's mark, "SCC Step II Inner Wrap," infringes on

Trenton's mark, "Pile Inner-Wrap." More specifically, Trenton contends that SCC's use of the term "Inner Wrap" infringes on its prior use of the term "Inner-Wrap" in the name of its product. Trenton now seeks an injunction which would prevent SCC from marketing its products using this term.

**A. Likelihood of Success on the Merits**

A trademark is defined as including "any word, name, symbol, or devise or any combination thereof" used by any person "to identify and distinguish his or her goods, including, a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. It is well settled that the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, protects both registered trademarks and unregistered marks from infringement. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, (1992). Specifically, 15 U.S.C. § 1125(a) recognizes a common law trademark claim and provides as follows:

> (a) Civil Action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

To prevail on its infringement claim, Trenton must show (1) ownership of a specific service mark in connection with specific services; (2) continuous use of the service mark; (3) establishment

of secondary meaning if the mark is descriptive, and; (4) a likelihood of confusion amongst consumers. *See Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1105 (6th Cir. 1991)). Although proof that the buying public was actually deceived is necessary in order to recover statutory damages under the Lanham Act, only a likelihood of confusion must be shown in order to obtain equitable relief. *See Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (*citing Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642, 647 (6th Cir. 1982).

As a threshold matter, Trenton must show that "Pile Inner-Wrap" is a valid and legally protectable trademark. *See Degidio v. West Group Corp.*, 355 F.3d 506, 509 (6th Cir. 2004). "Putative trademarks may either: (1) be inherently distinctive or (2) acquire distinctiveness through secondary meaning." *Id.* at 510 (*citing Two Pesos*, 505 U.S. at 769). Whether a mark qualifies for trademark protection is determined by where the mark falls along the established spectrum of distinctiveness. *See id.* at 510. Marks are generally classified in the following categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See id.* "Generic terms can never be trademarks, descriptive terms are not inherently distinctive and suggestive, arbitrary and fanciful terms are regarded as being inherently distinctive." *Id.* (*quoting* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:2 (4th ed. 2003)).

The present case turns on the distinction between descriptive and suggestive marks. A mark is descriptive if it describes "one, or more, of the following: the intended purpose, function or use of the goods ... the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *Id.* (*quoting Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir. 1988)) (internal quotations omitted). In contrast, suggestive marks "shed some light upon the qualities or characteristics of goods but ... are not descriptive of such goods in that an effort of the imagination

on the part of the observer would be required to know their nature." BEVERLY W. PATTISHALL ET AL., TRADEMARKS AND UNFAIR COMPETITION DESKBOOK § 2.04 at 19 (1996) (*quoting General Shoe Corp. v. Rosen*, 111 F.2d 95, 98 (4th Cir. 1940)) (internal quotations omitted).

In the present case, Trenton's "Pile Inner-Wrap" appears to be descriptive. The mark "Inner-Wrap" merely describes the purpose, function or use of Trenton's product. That is, this particular product is used as a wrap to cover a pipeline. Another wrap will subsequently be applied over the first wrap, making it the inner, or inside, wrap. Therefore, not much imagination is required on the part of consumers to "cull a direct message from the mark about the quality, ingredients, or characteristic of the product ...." *Degidio*, 355 F.3d at 510 (*quoting* 2 MCCARTHY § 11:71). Furthermore, the mark so closely describes the product that other sellers of similar products would likely use the term. *See id.* at 511. In fact, other sellers do use the term inner-wrap or a variation thereof to describe their products. *See id.*; Def.'s Ex. E. As a result, the term Inner-Wrap is not likely to be regarded a symbol of origin. *See id.* Thus, as a descriptive mark, Trenton must show that its use of Inner-Wrap has obtained a secondary meaning in order to succeed. *See id.* at 513.

To establish the existence of a secondary meaning, Trenton "must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Id.* (*quoting Inwood Labs., Inc. v. Ives Labs.*, 456 U.S. 844, 851 n. 11 (1982)) (internal quotations omitted). The Sixth Circuit uses the following seven factor test "to determine whether a mark has acquired secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying." *Id.* at 514.

Trenton has not produced any evidence with regard to any of the seven factors relevant to the determination of secondary meaning. There is no direct consumer testimony, consumer surveys or evidence that SCC intentionally copied Trenton's mark. Notably, the fact that the use of the term Inner-Wrap does not appear to be exclusive and that Trenton uses sales representatives and distributors rather than advertising, mitigates against a finding of secondary meaning. *See id.* at 513-14; *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (observing that "extensive advertising which results in consumer association with a single source" is needed to establish secondary meaning and finding that $100,000 in advertising was not enough to establish secondary meaning without further evidence that such advertising was extensive or beyond necessary to survive in the market); *K'Arsan Corp. v. Christian Dior Perfumes, Inc.*, 1998 WL 777987, at *5 (6th Cir. 1998) ("Third-party use of 'sun powder' (by at least two, and as many as five, other companies ...) weakens the mark."). Consequently, Trenton has not yet demonstrated that its mark is legally protectable and, therefore, has not shown a strong likelihood of success on the merits. Likewise, Trenton has failed to show a strong likelihood of success on its trademark dilution claim. *See D'Amato*, 469 F.3d at 547 (requiring the mark be famous or distinctive in order to state a claim for trademark dilution).

Assuming Trenton's mark is protectable, it has not made a sufficient showing that consumers would likely be confused by SCC's similar mark or attribute SCC's products to Trenton. The Sixth Circuit

> has identified eight factors that are relevant in determining whether a likelihood of confusion exists: (1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party

expanding its product line using the marks.

*Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002). While not all of the factors are relevant in every case, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.*

Trenton offered virtually no evidence on the issue of confusion. Trenton relies heavily on the similarity between its mark and the name of SCC's product. However, SCC points out that its product name is preceded by "SCC," which decreases the significance of this factor in the total analysis. *See id.* at 633-34. Further, Trenton's trademark does not appear to be strong in that it is not distinctive: several other companies also call their products inner-wrap and it is a descriptive term. *See* Def.'s Ex. E.

While Plaintiff has presented an affidavit from one of its distributors indicating that SCC's product and Trenton's product looked the same, the affidavit says nothing about whether SCC's use of the term Inner Wrap to describe its product would cause confusion among consumers. *See* McCabe Aff. ¶¶ 5-6. Interestingly, the color similarities appear to be inconsequential as both companies' product colors are standard in the industry for differentiating between the varying thicknesses of the inner-wraps. Trenton has not shown that confusion is likely and, thus, has failed to show a strong likelihood of success on the merits. Accordingly, this factor weighs against granting an injunction.

**B. Irreparable Harm**

In cases of trademark infringement, "no particular finding of ... irreparable harm is necessary for injunctive relief ...." *Midwest Guaranty Bank v. Guaranty Bank*, 270 F.Supp.2d 900, 923-24 (E.D. Mich. 2003) (*citing Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir.

1991)). This is because irreparable injury "ordinarily follows when a likelihood of confusion or possible harm to reputation appears" from infringement or unfair competition. *Wynn Oil*, 943 F.2d at 608.

In the present case, because Trenton has not shown a strong likelihood of success on the merits, it is not entitled to the presumption of irreparable harm. Trenton only claims that because SCC infringed on its trademark, it will lose its goodwill. However, Trenton has not demonstrated that SCC is infringing on a legally protectable mark. Further, Trenton has not shown that SCC's activities have caused it to lose any business whatsoever. In fact, SCC has not yet earned any revenue or sold any of its products. Consequently, Trenton has not produced evidence that it will be irreparably harmed if an injunction is not issued. Therefore, this factor weighs against issuing an injunction.

**C.  Harm to Defendants if an Injunction is Issued**

The Court must next weigh the harm to Plaintiff absent an injunction against the harm to Defendants if an injunction is issued. In the present case, Trenton has not demonstrated a likelihood of success on the merits of its trademark infringement and has not demonstrated that it will be irreparably harmed absent an injunction. Trenton does not ask the Court to shut down SCC or prevent it from marketing its products, but merely to prevent it from marketing its products in a way that they may be confused for Trenton's products. In contrast, SCC argues that it will be severely harmed if an injunction is issued. SCC states that it is a start up company and is in the process of developing its products. If the Court were to issue an injunction, SCC claims that it would be disastrous at this stage in its corporate life.

The Court fails to see how granting the relief Trenton is asking for with regard to the

trademark claims would be a "virtual death sentence" for SCC as Trenton is only seeking to prevent SCC from using the term Inner Wrap. On the other hand, Trenton has failed to show how it will be irreparably harmed if the Court does not grant injunctive relief. Consequently, this factor does not favor either party.

### D.  Public Interest

"The public interest is served by protecting one's trademark rights and avoiding confusion in the marketplace." *Midwest Guaranty*, 270 F.Supp.2d at 924-25. On the other hand, the public interest also favors allowing competition in the marketplace. *See Two Pesos*, 505 U.S. at 774. Granting too much protection to a descriptive mark without a sufficient showing of a secondary meaning would defeat the purpose of the Lanham Act by providing a disincentive for innovation among producers. Thus, this factor does not favor either party.

### V.  CONCLUSION

Trenton has not demonstrated a strong likelihood of success on the merits or that it will be irreparably harmed absent an injunction. These are by far the most important factors in the Court's analysis. Accordingly,

IT IS ORDERED that Plaintiff's Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED.

>                    s/Lawrence P. Zatkoff
>                    LAWRENCE P. ZATKOFF
>                    UNITED STATES DISTRICT JUDGE

Dated:  January 25, 2007

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on January 25, 2007.

s/Marie E. Verlinde
Case Manager
(810) 984-3290

12